PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1579

DENISE C. WILKINS, Individually and as Personal
Representative of the Estate of Justin Lamar Davis,

Plaintiff – Appellant,

v.

VICKI MONTGOMERY, Director, Central State Hospital, in her
individual and official capacities,

Defendant – Appellee,

and

CENTRAL STATE HOSPITAL; THE COMMONWEALTH OF VIRGINIA;
UNIDENTIFIED EMPLOYEES OF CENTRAL STATE HOSPITAL, in their
individual and official capacities,

Defendants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.   John A. Gibney, Jr.,
District Judge.  (3:12-cv-00152-JAG)

Argued: March 18, 2014                 Decided: May 5, 2014

Before GREGORY, WYNN, and THACKER, Circuit Judges.

Affirmed by published opinion.  Judge Thacker wrote the opinion,
in which Judge Gregory and Judge Wynn joined

**ARGUED**: Gregory L. Lattimer, LAW OFFICES OF GREGORY L. LATTIMER, Washington, D.C., for Appellant.  John David Gilbody, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.  **ON BRIEF**: Kenneth T. Cuccinelli, II, Attorney General, Wesley G. Russell, Jr., Deputy Attorney General, Peter R. Messitt, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

THACKER, Circuit Judge:

Appellant Denise C. Wilkins ("Appellant") appeals the district court's orders striking her expert witness; denying her second motion to amend her complaint; and granting summary judgment to Appellee Vicki Montgomery, Assistant Director for Clinical Administration at Central State Hospital. Appellant brought this action against Montgomery after her son, Justin Lamar Davis, was murdered by another patient at Central State Hospital. She filed three claims: grossly negligent supervision, gross negligence under the Virginia Wrongful Death Act, and a 42 U.S.C. § 1983 claim for supervisory liability.

The district court struck Appellant's expert witness because he was disclosed in an untimely fashion; denied Appellant's second motion to amend her complaint to add two defendants because such amendment would be futile; and finally, concluded there was insufficient evidence to support the claims against Montgomery, who was an assistant director in charge of administrative matters at the time of Davis's death. For the reasons set forth below, we affirm.

I.

A.

On January 5, 2010, Justin Lamar Davis was transferred to Central State Hospital ("CSH"), an inpatient facility providing treatment for patients with mental illnesses who are

3

referred by the court system. On February 16, 2010, George Phillips was admitted to CSH while waiting to be prosecuted for attempted capital murder. Both Phillips and Davis were housed in the forensic unit, Ward 39-8.

CSH had a policy whereby staff would issue 24-hour reports (also called "Administrator On Duty" or "AOD" reports) regarding patient activity. See J.A. 355-68.[1] AOD reports during the week of February 21, 2010, reflect that Davis struck a staff member in the face and hit another patient. On February 24, 2010, Phillips reported feeling threatened by Davis, and Phillips stated he "will not give [Davis] another warning and he will end up flying out of here in a helicopter to a hospital." Id. at 362. Phillips told the staff that he "could get a pen out of a staff's pocket if he wanted and harm [him]self or anyone else." Id.

The next day, on February 25, 2010, Phillips and Davis had an altercation in the gymnasium. Phillips attacked Davis from behind, but Davis was not injured. The AOD report, which was issued the following day on February 26, explained that Davis "feels others want to harm him and wanted to be moved off the unit." J.A. 365. It also stated that Dr. Sridhar Yaratha,

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

the psychiatrist on Davis's treatment team at CSH, was "aware" of Davis's desire to move. Id. In addition, the report stated that after the altercation, Phillips told staff "he was tired of Mr. Davis and that he could have easily snapped his neck." Id. On the evening and night of February 25, Phillips was "monitored constantly by staff and behavior documented [on] every shift." Id. Indeed, on that day, and for at least one week prior, Phillips was on suicide observation status ("SOS"), violence observation status ("VOS"), and escape observation status ("EOS"), which required "15 minute[] monitoring checks by assigned staff." Id. at 356, 373.

On February 27, 2010, Davis was also on VOS and also required 15 minute checks. The charge nurse, Lawrence Harris, assigned to Essence Thompson, Forensic Mental Health Technician, the duty of carrying out the 15 minute checks that night. However, rather than conducting the required checks, both Harris and Thompson were watching television in a nearby room. Between 9:36 p.m. and 9:56 p.m. that night, Phillips left his room, entered Davis's room, and proceeded to strangle Davis to death in his bed. It was not until the following morning, February 28, that another staff member discovered that Davis was dead.

An investigation by the hospital concluded that "[s]taff [n]eglect" led to Davis's murder, and found that "Thompson . . . remained seated in the chair directly facing the

5

television" on the night of Davis's death, which "provided []
Phillips the opportunity to do serious harm to [] Davis." J.A.
377. In addition, the hospital report concluded Harris "failed
to provide the necessary supervision and leadership required to
ensure [] Thompson was at her assigned monitoring post and
carrying out her assigned duties. Instead, Mr. Harris sat one
seat from [] Thompson directly facing the television." Id.

B.

Exactly two years after Davis's death, February 27,
2012, Appellant -- Davis's mother -- filed suit against CSH, the
Commonwealth of Virginia, Vicki Montgomery ("Appellee"), and
"Several as of Yet Unidentified Employees of [CSH]."[2] See
Wilkins v. Cent. State Hosp., No. 3:12-cv-00152-JAG (E.D. Va.
Feb. 27, 2012), ECF No. 1. The original complaint contained
three counts: wrongful death based on gross negligence, grossly
negligent supervision, and a 42 U.S.C. § 1983 claim for
supervisory liability.

On April 4, 2012, Appellant filed the First Amended
Complaint ("FAC"). In the FAC, Appellant dropped the state

---

[2] At oral argument, Appellant's counsel told the court that
he filed this action 23 months after Davis's death; however, we
note that this action was actually filed on the final day in the
two-year statute of limitations period. See Oral Argument at
18:10-20, Wilkins v. Montgomery, No. 13-1579 (4th Cir. Mar. 18,
2014), available at http://www.ca4.uscourts.gov/oral-
argument/listen-to-oral-arguments.

6

defendants, and the only defendants remaining were Appellee (in her individual and official capacity), who was incorrectly listed as "director" of the CSH, and "Several as of Yet Unidentified Employees of [CSH]." J.A. 9. The FAC contained the same three counts and allegations as the original complaint.

On April 11, 2012, Appellee filed a motion to dismiss, but withdrew that motion on May 4, 2012, when she filed a motion for summary judgment. In the motion for summary judgment, Appellee argued that because she was not director of CSH at the time of Davis's death, she had no supervisory responsibility or authority over any security personnel, treatment staff, or medical staff.

The district court entered a pre-trial order and set the trial date for February 19, 2013. Appellant's Rule 26(a)(2) expert disclosures were to be produced by October 22, 2012; however, this deadline was moved back to November 21, 2012, by agreement of the parties. The deadline for motions challenging experts was December 21, 2012. On November 21, Appellant provided the name of her purported expert witness, Dr. Pogos H. Voskanian, along with a curriculum vitae, but no written report. Almost two weeks after the November 21 deadline for Rule 26 disclosures -- which had been agreed to by Appellant -- on December 4, 2012, Appellant disclosed what she called a

7

"preliminary report" by Dr. Voskanian.[3]  The preliminary report, as its name suggests, was only one page and simply contained a list of the materials the expert reviewed, and two sentences of opinion:

> Based on review of the above listed documents, it is my opinion to a reasonable degree of medical certainty that the care and treatment provided to Mr. Justin Lamar Davis fell substantially below an acceptable standard of care.  Administration of the hospital failed to provide adequate services and supervision; and members of the treatment team failed to provide adequate monitoring, safety and treatment, amounting to deliberate indifference to the patient's needs and premature death of Mr. Justin Davis.

J.A. 99.

On December 13, 2012, Appellee filed a renewed motion for summary judgment and a motion to exclude Appellant's expert witness.  On December 21, 2012 -- now one month after the expert disclosure date agreed to by Appellant, and on the court's deadline for filing motions to exclude experts -- Appellant filed an additional, nine-page expert report by Dr. Voskanian.

The district court held a motions hearing on February 7, 2013, and granted the motion to exclude Dr. Voskanian the following day.  See J.A. 268-70 (the "February 8 Order").

---

[3]  Appellant submits that Dr. Voskanian actually provided Appellant's counsel with the preliminary report on November 26, but "through inadvertent oversight," it was not provided to Appellee's counsel until December 4.  J.A. 67.

8

Appellant then filed a Rule 59 motion to alter or amend the February 8 Order.

In the meantime, on December 27, 2012, Appellant filed a motion for leave to file a second amended complaint. She sought only to add as defendants Dr. Charles Davis -- the actual director of CSH at the time Davis was murdered -- and Dr. Yaratha.

On April 10, 2013, the district court held a hearing on the remaining outstanding motions, including the motion to amend. The court ruled from the bench, granting the motion for summary judgment, and denying the motion to amend the complaint and the Rule 59 motion to alter or amend its order excluding Dr. Voskanian. A formal order issued the following day. See J.A. 663 (the "April 11 Order").

Appellant filed a timely notice of appeal of the February 8 and April 11 Orders.

## II.

We review the district court's exclusion of a plaintiff's expert witness, its denial of a motion to amend the complaint, and its ruling on a Rule 59 motion to alter or amend for abuse of discretion. See S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 595 (4th Cir. 2003); Laber v. Harvey, 438 F.3d 404, 428 (4th Cir. 2006); Sloas v. CSX Transp., Inc., 616 F.3d 380, 388 (4th Cir. 2010). As to the

9

motion to amend the complaint, we review the district court's analysis of the law regarding relation back de novo. See Locklear v. Bergman & Beving AB, 457 F.3d 363, 365 (4th Cir. 2006).

We review the district court's grant of summary judgment de novo. See Pisano v. Strach, 743 F.3d 927, 932 (4th Cir. 2014). Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists

> if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed. The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials.

Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (internal citations omitted).

III.

A.

We first discuss Appellant's challenge to the district court's exclusion of her expert, Dr. Voskanian. This issue implicates both the February 8 Order excluding Dr. Voskanian,

10

and the portion of the April 11 Order denying Appellant's Rule 59 motion to alter or amend the February 8 Order.

At the February 7 motions hearing, the district court ruled as follows:

> The expert will be excluded. You just can't -- if we were to allow him to testify it would just turn everything that is in the pretrial order on its head. Let me just say that I think the question of deliberate indifference, if that is the standard used in this case, is one you can argue to the jury based on what the administrators knew and when they knew it. I don't think you need an expert on that.

J.A. 558. At the April 10 hearing, regarding the Rule 59 motion, the district court stated,

> Th[e] motion [to alter or amend the February 8 Order] will be denied . . . , for two reasons. First, the plaintiff was just way late in naming an expert in this case. And I know how hard it is to find experts for cases like this. But we have those deadlines so we can move in an orderly fashion. And the lateness with which the expert was identified would not allow that to happen. Second, the expert witness' report is pretty much a brief of legal conclusions in the case, and I don't think it is something that offers expert opinions on the issues on which an expert might be allowed to testify in this case.

Id. at 661.

The Pre-Trial Order in this case stated, "The parties will disclose the information required under Rule 26(a)(2) on the following schedule: Party with the burden of proof on an issue by October 22, 2012," which was later moved to November 21, 2012, by consent of the parties. Wilkins v. Cent. State Hosp., No. 3:12-cv-00152 (E.D. Va. filed Aug. 21, 2012), ECF No.

11

26 at 2 (pre-trial order); see also id. ECF No. 30 (filed Oct. 25, 2012) (order granting consent motion to amend pre-trial order).

Federal Rule of Civil Procedure 26(a)(2) provides,

> [A] party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705. . . . Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report -- prepared and signed by the witness -- if the witness is one retained or specially employed to provide expert testimony in the case[.]

Fed. R. Civ. P. 26(a)(2)(A), (B) (emphasis supplied). Furthermore, "[a] party must make these disclosures at the time and in the sequence the court orders." Fed. R. Civ. P. 26(a)(2)(D) (emphases supplied). Therefore, because Appellant did not disclose the written report by the agreed-upon deadline, she necessarily violated the Pre-Trial Order and Rule 26(a)(2).

In light of this violation, we cannot say the district court abused its discretion in excluding Dr. Voskanian as an appropriate sanction. Rule 37(c)(1) provides,

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). This court has explained,

> Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses. A party that fails to provide these disclosures unfairly

12

inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case. For this reason, "we give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)."

Saudi v. Northrop Grumman Corp., 427 F.3d 271, 278-79 (4th Cir. 2005) (quoting S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 595 (4th Cir. 2003)) (alteration omitted); see also S. States, 318 F.3d at 592 n.2 ("The Rule 37(c) advisory committee notes emphasize that the 'automatic sanction' of exclusion 'provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence.'" (quoting Fed. R. Civ. P. 37(c) advisory committee note, 1993 Amendment) (emphasis supplied)).[4]

In Southern States, we elaborated,

The language of Rule 37(c)(1) provides two exceptions to the general rule excluding evidence that a party seeks to offer but has failed to properly disclose: (1) when the failure to disclose is "substantially justified," and (2) when the nondisclosure is "harmless."

. . .

[I]n exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1)

---

[4] See also Campbell v. United States, 470 F. App'x 153, 156 (4th Cir. 2012) (per curiam) ("[T]he Federal Rules impose an 'automatic sanction' of exclusion of a party's expert witness for failure to adhere to the expert witness requirements set forth in Rule 26(a)." (quoting S. States, 318 F.3d at 592 n.2)).

13

exclusion analysis, a district court <u>should be guided by</u> the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

318 F.3d at 596-97 (emphasis supplied) (alterations omitted). The burden of establishing these factors lies with the non-disclosing party -- in this case, Appellant. <u>See</u> <u>id.</u> at 596 ("'It is the obligation of the party facing sanctions for belated disclosure to show that its failure to comply with Rule 37(c)(1) was either justified or harmless.'" (quoting <u>Wilson v. Bradlees of New England, Inc.</u>, 250 F.3d 10, 21 (1st Cir. 2001)) (alterations omitted). Appellant argues that the district court was required to weigh the <u>Southern States</u> factors before excluding Dr. Voskanian, it failed to do so, and even if it had done so, it would have concluded that the late disclosure was harmless.[5] We disagree on all counts.

First of all, the district court was not <u>required</u> to tick through each of the <u>Southern States</u> factors. <u>Southern States</u> explains that district courts have "broad discretion" to decide harmlessness and "should" -- not "shall" -- "be guided by" the five factors. <u>S. States</u>, 318 F.3d at 597; <u>see also</u>

_____

[5] Appellant does not argue the late disclosure was "substantially justified." <u>S. States</u>, 318 F.3d at 597.

14

United States v. Maria, 186 F.3d 65, 70 (2d Cir. 1999) ("[T]he common meaning of 'should' suggests or recommends a course of action, while the ordinary understanding of 'shall' describes a course of action that is mandatory."); Hoyle v. Freightliner, LLC, 650 F.3d 321, 330 (4th Cir. 2011) ("[T]he fact that the district court did not expressly mention the five-factor test we adopted in Southern States is not indicative of an abuse of discretion."); Carr v. Deeds, 453 F.3d 593, 604 (4th Cir. 2006) (affirming the district court's exclusion of testimony for Rule 26(a) violation when the Southern States factors were not mentioned). Thus, the district court's failure to cite Southern States and specifically address each of the five factors listed therein does not amount to an abuse of discretion.

Second, the district court implicitly addressed some of the Southern States factors when deciding whether to exclude Dr. Voskanian as an expert witness. For example, it invoked the third factor when it discussed the disruption of the trial date and Pre-Trial scheduling order. See J.A. 558 ("[I]f we were to allow him to testify it would just turn everything that is in the pretrial order on its head."); id. at 661 ("[T]he plaintiff was just way late in naming an expert in this case. . . . [W]e have those deadlines so we can move in an orderly fashion. And the lateness with which the expert was identified would not allow that to happen."). The district court also touched on the

15

fourth factor, when it stated that the expert testimony would not assist a trier of fact. See id. at 558 ("Let me just say that I think the question of deliberate indifference . . . is one you can argue to the jury based on what the administrators knew and when they knew it. I don't think you need an expert on that."); id. at 661 ("[T]he expert witness' report is pretty much a brief of legal conclusions in the case, and I don't think it is something that offers expert opinions on the issues on which an expert might be allowed to testify in this case."). And, as to factor five, Appellant provided no reason whatsoever for its failure to disclose the evidence in a timely manner. See Appellant's Br. 28-29 (providing arguments on the first four factors but not the fifth).

Finally, our own review of the Southern States factors demonstrates that Appellant's error was far from harmless. In addition to the reasons provided by the district court, Appellant's initial disclosure failed to provide Appellee with any concrete explanation of Dr. Voskanian's potential testimony. The disclosure was made after the agreed-upon expert disclosure date, after discovery was closed, after Appellee filed a motion for summary judgment, and on the very date set by the court for the filing of motions to exclude experts. It is hard to accept that these events would not serve as a surprise to Appellee, or that Appellee could easily cure such a surprise. See Hoyle, 650

16

F.3d at 330 (finding no abuse of discretion where district court excluded expert declaration when the disclosing party notified his opponent of the declaration "not only after the close of discovery but after [the opponent] had filed its motion for summary judgment").

For these reasons, we find no abuse of discretion in the district court's exclusion of Dr. Voskanian as an expert witness.

B.

We next turn to Appellant's argument that the district court abused its discretion in denying her motion to amend her complaint for the second time.

In the proposed amended complaint, Appellant sought to add two defendants: Dr. Davis, director of CSH at the time Justin Davis was murdered, and Dr. Yaratha, the psychiatrist on Justin Davis's treatment team at CSH. The district court denied the motion because it would be futile, i.e., there was no evidence of a "pervasive risk of constitutional injury" and no evidence that Drs. Davis and Yaratha were "deliberately indifferent to the knowledge of the risk." J.A. 659. As explained more fully below, we hold that Appellant's proposed third amended complaint would not relate back; therefore, we affirm the district court on that ground. See United States v. Aparicio-Soria, 740 F.3d 152, 154 (4th Cir. 2014) (en banc) ("We

17

may . . . affirm the district court on any ground in the record[.]").

1.

Appellant filed the second motion to amend and proposed amended complaint on December 27, 2012, ten months after the statute of limitations had expired. See Lewis v. Richmond City Police Dep't, 947 F.2d 733, 735 (4th Cir. 1991) ("There is no federal statute of limitations for § 1983 claims, so the state limitations period which governs personal injury actions is applied. . . . Virginia has a two-year statute of limitations for personal injury claims." (citing Va. Code Ann. § 8.01–243(A))); A Soc'y Without A Name v. Virginia, 655 F.3d 342, 348 (4th Cir. 2011) (applying Virginia law) ("With regard to the § 1983 . . . claim[], the statute-of-limitations period . . . is two years."). Therefore, "unless the amended complaint . . . relates back to the date of the original filing, it will be barred by the statute of limitations and subject to dismissal." Locklear v. Bergman & Beving AB, 457 F.3d 363, 365 (4th Cir. 2006).

In determining whether an amended complaint relates back, we look to Federal Rule of Civil Procedure 15(c)(1), which provides,

> An amendment to a pleading relates back to the date of the original pleading when,

18

. . .

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint,[6] the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1); see also Robinson v. Clipse, 602 F.3d 605, 608 (4th Cir. 2010) (explaining that when a proposed amendment changes the party against whom a claim is asserted, the amending party must satisfy the requirements set forth in Rule 15(c)(1)(C)(i) and (ii)). This rule "presumes that the amending party can make the amendment, although it does constrain substantially the type of amendment that may relate back." Goodman v. Praxair, Inc., 494 F.3d 458, 469 (4th Cir. 2007) (en banc).

---

[6] Rule 4(m) requires that a defendant be served within 120 days after the complaint is filed, absent good cause. See Fed. R. Civ. P. 4(m).

19

When an amendment seeks to add a defendant, the focus turns to the notice to that individual or entity. Specifically, as to Rule 15(c)(1)(C)(ii), the Supreme Court has clarified, "The question . . . is not whether [the amending party] knew or should have known the identity of . . . the proper defendant, but whether [the potential defendant] knew or should have known that it would have been named as a defendant but for an error." Krupski v. Costa Crociere, 560 U.S. 538, 548 (2010). We have explained,

> Rule [15]'s description of when such an amendment relates back to the original pleading focuses on the notice to the new party and the effect on the new party that the amendment will have. These core requirements preserve for the new party the protections of a statute of limitations. They assure that the new party had adequate notice within the limitations period and was not prejudiced by being added to the litigation.

Goodman, 494 F.3d at 470 (citation omitted) (emphases in original); see also Norton v. Int'l Harvesters Co., 627 F.2d 18, 20 (7th Cir. 1980) ("[P]rejudice within the meaning of [Rule 15] is prima facially established where a party named as an additional defendant in the amended complaint is deprived of the defense of the statute of limitations."); Hageman v. Signal L. P. Gas, Inc., 486 F.2d 479, 484 (6th Cir. 1973) ("[A]n amendment adding another party is a new cause of action which cannot be added after the time limitation has expired."); cf. Goodman, 494 F.3d at 468 ("Rule 15(c) must be understood to freely permit

20

amendment of pleadings and their relation-back so long as the policies of statutes of limitations have been effectively served.").

2.

The proposed amended complaint in this case clearly meets the first requirement of Rule 15(c)(1)(C)(3) -- that Rule 15(c)(1)(B) is satisfied, that is, the claims in the amended complaint "arose out of the conduct, transaction, or occurrence" in the original complaint -- because it seeks to add defendants rather than to alter the underlying causes of action. See Locklear, 457 F.3d at 365-66. Therefore, we focus on whether, within the period of time provided by Rule 4(m), Drs. Davis and Yaratha "received such notice of the action that [they] w[ould] not be prejudiced in defending on the merits," and "knew or should have known that the action would have been brought against [them], but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(i), (ii).

Appellant argues that Drs. Davis and Yaratha had notice of the complaint and thus, "there was absolutely no prejudice that could be identified." Appellant's Br. 32. However, the record evidence shows that Dr. Yaratha did not receive notice of the lawsuit against Appellee until he was asked to attend a deposition in the matter on November 8, 2012 -- eight months after the initial complaint was filed and the

21

statute of limitations had expired, and four months after the time period set forth in Rule 4(m).  See J.A. 260 (Yaratha Declaration) ("I first became aware of the lawsuit . . . on November 8, 2012, when I was asked to attend a deposition in this matter.").  Dr. Davis was not made aware until December 28, 2012, when he received an email from Appellee's office about the case -- ten months after the initial complaint was filed and the statute of limitations had expired, and six months after the time period set forth in Rule 4(m).  See id. at 259 (Davis Declaration), 467-68 (Davis Deposition).

Appellant offers no evidence to the contrary. Instead, she merely contends that Drs. Davis and Yaratha "clearly had notice of the complaint," based on the allegations that they were represented by the same office as Appellee. Appellant's Br. 32.  There is zero support in the record for this contention.  Rather, it is belied by the record.  See J.A. 444, 489 (indicating that Dr. Davis and Dr. Yaratha were represented at their depositions by the law firm Rawls McNelis & Mitchell, not by the Office of the Attorney General, which represented Appellee).  Appellant further asserts that Dr. Davis had notice of the lawsuit because he "still has an office and practices medicine [at CSH]."  Appellant's Br. 35.  This assertion is also belied by the record.  See J.A. 449-50 (Dr.

22

Davis's deposition, stating that he retired from CSH in May 2010).

Appellant also submits that knowledge should be imputed to Drs. Davis and Yaratha because they have "'a sufficient identity of interest with the original defendant.'" Appellant's Br. 36 (quoting Goodman, 494 F.3d at 474). Goodman states, "we can conclude that when a plaintiff alleges a comprehensible claim against one of a group of closely related and functioning business entities or corporations, the other entities in that group, barring a contrary showing, will be charged with knowledge under Rule 15[] of the entity properly answerable to the claim." Goodman, 494 F.3d at 475.

But in Goodman, the business entities in question were a parent and subsidiary corporation, which were represented by the same lawyers. See Goodman, 494 F.3d at 475. Indeed, the subsidiary corporation in Goodman "concede[d] it had notice but thought . . . that Goodman intended to sue [the parent corporation]." Id. This case is markedly different. As explained above, the evidence demonstrates that Drs. Yaratha and Davis did not receive notice of the lawsuit against Appellee until November 8, 2012, and December 28, 2012, respectively, and they had different attorneys than Appellee. Moreover, Appellant has provided no evidence that Dr. Davis even kept in touch with the employees at CSH after his retirement in May 2010 such that

23

he could still even be considered "closely related" to CSH. Goodman, 494 F.3d at 475. There is likewise no evidence that Dr. Yaratha worked so closely with Appellee as to be imputed with knowledge of the lawsuit against her.

Therefore, in reviewing the evidence presented at summary judgment, we must conclude that Drs. Davis and Yaratha "received [no] notice of the action" against Appellee within the 120-day period set forth in Rule 4(m) and were thus "prejudiced in defending [the claim] on the merits." Fed. R. Civ. P. 15(c)(1)(C)(i). Compare Krupski, 560 U.S. at 554 (holding that amended complaint should relate back because the district court found that the added party had "constructive notice" of the initial complaint within the Rule 4(m) period, and the added party did not challenge that finding), with J.A. 657-58 (district court finding that "neither [Dr.] Yaratha or [Dr.] Davis had notice of the suit within 120 days of its filing"). Appellant has likewise failed to produce any evidence that the potential defendants "knew or should have known" that the action would have been brought against them, but for an error in naming Appellee. Fed. R. Civ. P. 15(c)(1)(C)(ii); Krupski, 560 U.S. at 548. Thus, the proposed amendment to the complaint would not relate back, and the district court did not abuse its discretion in denying the motion to amend.

24

C.

We now turn to whether the district court erred in granting summary judgment in favor of Appellee on the 42 U.S.C. § 1983 and gross negligence claims. Having concluded, supra, that Drs. Davis and Yaratha cannot be added to this action, and that Dr. Voskanian was properly excluded as an expert, we need only address the non-expert record evidence with respect to Appellee.

1.

§ 1983 Claim

In order to succeed on a § 1983 claim for supervisory liability, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that h[er] subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;
>
> (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and
>
> (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). As to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and

25

that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." Id. As to the second element, a plaintiff "may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." Id. (internal quotation marks omitted). Finally, as to the third element, "proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions." Id. (internal quotation marks and alterations omitted).

Appellant fails to provide sufficient evidence on any of these three elements with regard to Appellee. First, there is no evidence that Appellee had actual or constructive knowledge that Harris and Thompson, the charge nurse and mental health technician, were engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to Davis. To the contrary, Appellee was not even working on the night in question, and there is no evidence the staff members had behaved in such a manner in the past such that their conduct was "widespread," or that they had neglected their duties on "several different occasions." Shaw, 13 F.3d at 799.

Nonetheless, Appellant argues that Appellee had an overarching duty to keep the patients at CSH safe. See

26

Appellant's Br. 12 (citing J.A. 160, 161-62) (Appellee agreed that she "was [in addition to Dr. Davis] responsible for running the hospital" and that the hospital administration had a non-delegable obligation "to provide a safe environment for the patients[.]"). While this may be true, it does not relieve Appellant of the burden of showing a pervasive risk of harm that Appellee knew about, actually or constructively -- a burden that Appellant has not met.

In addition, Appellant assumes that Appellee saw all of the AOD reports regarding the tension between Davis and Phillips. But as Appellee points out, she only worked Monday through Thursday during the week that Davis was murdered. Her time sheet shows that she clocked out at 6:41 p.m. on Thursday, February 25, 2010, and did not work Friday, Saturday, or Sunday of that weekend. Therefore, the record evidence shows that Appellee would not have seen the AOD report about the occurrences of February 25, which described the altercation in the gymnasium between Davis and Phillips, because it was generated the following day, February 26. In fact, the only knowledge of harm Appellee had about Davis and Phillips that week was the report from February 24, which reflected that Phillips felt threatened by Davis, and that Phillips had stated that he (Phillips) could harm himself or someone else.

Appellant has also failed to show sufficient evidence that Appellee was deliberately indifferent to or tacitly authorized widespread abuses of patient supervision. In this regard, Appellant points to the deposition of the nursing coordinator and supervisor, Bernadette Spruill, who stated that she was not aware that Phillips threatened to hurt or kill Davis, even though such information was listed in the AOD reports from that week. As a result, Spruill did not "take any actions in terms of staffing the unit to address any concerns regarding Mr. Davis's safety." J.A. 416. While this lack of communication is gravely unfortunate, Appellant proffers no evidence to show either that this was a widespread problem or that Appellee knew about it but did nothing to remedy the situation.

In fact, there _was_ a system in place to address threats like those made to Davis. Phillips was placed on VOS, EOS, and SOS, and was supposed to be monitored every 15 minutes, according to hospital policy. And, the fact that this was not done by staff members on a Friday night, which was Appellee's day off, does not impute deliberate indifference to her.

Appellant relies heavily on Slaken v. Porter, 737 F.2d 368 (4th Cir. 1984). But even that case recognized that a supervisor cannot "reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when

28

he has no basis upon which to anticipate the misconduct." Id. at 373. Here, there is no evidence whatsoever that Appellee could have known that the nursing staff would watch television rather than check on Davis and Phillips.

In addition, Dr. Yaratha had considered the idea of moving Davis to a different ward, but after deliberation, decided against it. See J.A. 377 (Dr. Yaratha "met and discussed informally with [other doctors] about moving Mr. Davis. It was decided that the best place to monitor and manage [him] was on ward 8. Mr. Davis was very violent and aggressive before coming to ward 8 and during his first few weeks on ward 8. He would not do well with changing wards."). Thus, to the extent the decisions of Dr. Yaratha and others can be imputed to Appellee, those decisions clearly illustrate concern and discussion, rather than deliberate indifference.

Finally, Appellee's job duties were patently administrative in nature. See J.A. 146-48 (Appellee's position description for "Assistant Director for Clinical Administration," which included, inter alia, "provid[ing] direction to and oversight of the operations of [CSH]"; "assess[ing], develop[ing], monitor[ing], and evaluat[ing] the clinical and forensic operations of the hospital"; and "[p]rovid[ing] administrative and operational supervision to medical/clinical department and forensic services directors").

29

Nowhere is there a requirement that she have supervision over the security or monitoring of the patients in Ward 39-8.

For these reasons, Appellant has failed to meet her burden on summary judgment, and the district court did not err in granting Appellee's motion on the § 1983 claim.

2.

Gross Negligence

Appellant also brought state law claims for common law grossly negligent supervision, and gross negligence under the Virginia Wrongful Death Act, Va. Code Ann. § 8.01-50. "Gross negligence" is

> a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person. This requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness.

Cowan v. Hospice Support Care, Inc., 603 S.E.2d 916, 918 (Va. 2004). Gross negligence is more serious than simple negligence, which "involves the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another." Id.

> Proof of gross negligence depends upon the facts and circumstances of the particular case. If fair minded people can differ respecting the conclusion to be drawn from the evidence, a jury question is presented. On the other hand, if the evidence is such that fair minded people cannot differ, the question whether gross negligence has been established is one of law.

30

<u>Meagher v. Johnson</u>, 389 S.E.2d 310, 311 (Va. 1990) (internal quotation marks and alterations omitted).

Based on the dearth of evidence provided by Appellant, as explained above, Appellant falls far short of creating a triable issue as to whether Appellee's actions, or alleged lack thereof, "would shock fair-minded persons." Indeed, the Virginia cases allowing gross negligence claims to proceed to trial are far more egregious. <u>See, e.g.</u>, <u>Koffman v. Garnett</u>, 574 S.E.2d 258, 260 (Va. 2003) (allowing gross negligence issue to go to a jury where 260-pound football coach aggressively tackled a 13-year-old, 144-pound, inexperienced football player, breaking his left arm); <u>Nichols v. Brizendine</u>, 169 S.E.2d 457, 460 (Va. 1969) (same, where driver of an automobile deliberately increased speed on a straight portion of a narrow road, which had an upcoming curve that driver knew about, and the car skidded 46 feet and collided head-on with a tree, severely injuring the passengers). Thus, as a matter of law, Appellee is entitled to summary judgment on this claim.

IV.

For the foregoing reasons, the judgment of the district court is

<u>AFFIRMED</u>.

31