Affirmed in part, vacated in part, and remanded by published opinion. Judge Floyd wrote the opinion in which Judge Harris joined. Judge Bailey wrote a separate opinion concurring in part and dissenting in part.
FLOYD, Circuit Judge:
Defendants Barry Coggins and Collette Coggins, doing business as the Cherokee Bear Zoo (collectively, “the Zoo”), keep, care for, and exhibit bears. In 2013, Plaintiffs Peggy Hill and Amy Walker (collectively, “Plaintiffs”) visited the Zoo, and observed four of the Zoo’s bears living in what Plaintiffs believed to be an inhumane setting. In response, Plaintiffs brought the instant suit against the Zoo, claiming that the Zoo’s allegedly poor maintenance of its bears constitutes an unlawful taking proscribed by the Endangered Species Act (ESA), 16 U.S.C. § 1538 et seq.
The district court approved of Plaintiffs’ standing to bring their suit, and found that the four subject bears were grizzly bears protected by the ESA. The court nonetheless concluded that the manner in which the Zoo maintains its bears—although “archaic,” Hill v. Coggins, No. 2:13-cv-47, 2016 WL 1251190, at *14 (W.D.N.C. Mar. 30, 2016)—does not amount to an unlawful taking.
For the reasons that follow, we affirm the district court’s rulings in favor of Plaintiffs on the issues of standing and the subject bears’ status as protected grizzly bears. We conclude, however, that the court’s ruling against Plaintiffs on the issue of whether the Zoo is committing an unlawful taking was premised on incorrect legal analysis. We therefore vacate that ruling and remand this case for further proceedings.
I.
Plaintiffs reside within the Qualla Boundary in Cherokee, North Carolina. Plaintiffs are members of the Eastern Band of Cherokee Indians (“EBCI”). Like many members of the EBCI, Plaintiffs possess a deep cultural and spiritual connection with wildlife, including bears.
On March 28, 2013, Plaintiffs visited the Zoo. Plaintiffs observed a sign on the Zoo’s premises advertising grizzly bears; they *503 then proceeded to two bear pits containing four bears, at least three of which were identified by nearby signs as grizzly bears. The pits were compact and made entirely of concrete. Each pit had a small pool of water, but neither had any vegetation nor any shade.
Plaintiffs observed the bears in listless form, pacing around in their pits. They also witnessed the bears begging for food, with patrons responding by feeding the bears apples and dry bread sold by the Zoo.
Ms. Hill observed the bears for a period of approximately thirty minutes, while Ms. Walker observed the bears for a period of fifteen to twenty minutes. Plaintiffs claim to have left feeling angry and upset with what they observed at the Zoo. Plaintiffs refuse to return to the Zoo while the bears are in their current living conditions, but they have expressed a desire to return if those conditions are improved.
After their encounter with the bears, Plaintiffs brought this citizen suit against the Zoo in federal district court. Plaintiffs alleged that the Zoo’s practice of keeping four (apparent) grizzly bears in the above-described living conditions constitutes a “takfing]” of a threatened species proscribed by 16 U.S.C. § 1538(a)(1)(B), and possession of a “taken,” threatened species proscribed by 16 U.S.C. § 1538(a)(1)(D). The basis for these allegations was Plaintiffs’ view that the Zoo’s conduct is a form of “harass[ment]” of, and “harm” to, its bears. See 16 U.S.C. § 1532(19) (defining “take” as, inter alia, “to harass” or “harm”). Plaintiffs sought injunctive relief in response to the Zoo’s alleged violations of the ESA.
The Zoo filed a motion to dismiss Plaintiffs’ suit, which the district court denied on June 17, 2014. The Zoo subsequently filed a motion for summary judgment, which the district court denied on August 13, 2015. As a result, on September 17 and 18, 2015, the parties participated in a bench trial. At trial, Plaintiffs gave testimony describing their observations of the bears, their corresponding reactions, and their desires to observe the bears living in humane conditions.
Plaintiffs also presented extensive evidence demonstrating that the subject bears are grizzly bears. This evidence includes exhibits of the Zoo’s webpage, entitled “Grizzlies Page,” J.A. 673-74, which identified the four bears as grizzly bears; signs at the Zoo’s facility identifying at least three of the four bears as grizzly bears; veterinary records identifying the four bears as grizzly bears; and United States Department of Agriculture (USDA) reports identifying at least some of the bears as grizzly bears. Additionally, Edward Ramsay, D.V.M.—one of Plaintiffs’ expert witnesses and a diplómate of the American College of Zoological Medicine— identified the subject bears as grizzly bears based on his observation of distinctive shoulder humps on the bears.[1]
Finally, Plaintiffs proffered expert testimony that highlighted serious deficiencies in the Zoo’s treatment of its bears. Dr. Ramsay and Ms. Else Poulson—a zookeeper and animal behaviorist—testified that the Zoo’s virtually barren concrete pit enclosures, public feeding arrangements, and *504 apparent lack of meaningful enrichment programs fell short of generally accepted animal husbandry practices. Ms. Poulsen added that the, small concrete pits prompted the bears to engage in the abnormal behavior, of pacing, Ms. Poulsen, along with Dr. Ramsay, also identified the bears’ act of begging for food as an abnormal behavior that was attributable to the Zoo’s practice of public feeding and its inadequate nourishment of the bears.
The Zoo attempted to push back on Plaintiffs’ evidentiary presentation. Ms. Coggins testified that the Zoo had described the subject bears as grizzly bears only for promotional purposes. Additionally,’ David Ackerman, D.V.M.—the Zoo’s primary veterinary care provider—testified that the subject bears are European brown bears.
Ms. Coggins and Dr. Ackerman also testified that the subject bears are in good health, and do not demonstrate abnormal behavior. Dr. Ackerman added that although current zookeeping practices for brown bears—a category that includes grizzly bears—provide for more space and a more natural environment than the Zoo currently provides, he has had discussions with Mr. Coggins about implementing such practices in the future.'
On March 30, 2016, the district court issued its decision in this case. Hill, 2016 WL 1261190. The court first held that Plaintiffs had standing to litigate their ESA suit, because Plaintiffs had demonstrated that the Zoo was injuring their aesthetic interest in viewing the subject bears in a setting compatible with the ESA, in a manner that could be redressed by injunctive relief calling for such a setting. The court then considered the conflicting evidence, weighed the credibility of witnesses, assessed the relevant discovery history, and arrived at the conclusion that the subject bears are grizzly bears protected by the ESA.
In the end, however, the court ruled against Plaintiffs on the issue of the Zoo’s ESA liability. After examining the relevant regulations, the court concluded that the Zoo’s manner of maintaining its bears did not—for ESA purposes—harm or harass the bears, and by extension did not subject the bears to a taking.
• Of note, the court based its conclusion that the Zoo did not harass its bears entirely on its determination that the Zoo’s animal husbandry practices complied with applicable standards under the Animal Welfare Act (AWA), 7 U.S.C. § 2131 et seq, The court explicitly declined to consider whether the Zoo’s practices complied with “generally accepted” animal husbandry practices, despite language in the relevant regulation referencing a “generally accepted” standard. See 60 C.F.R. § 17.3 (explaining that the definition of “[hjarass” under the ESA excludes “generally accepted .., [ajnimal husbandly practices that meet or exceed the minimum standards for facilities and care under the [AWA] ” (emphasis added)). The court also found it unnecessary to consider whether the Zoo’s practices are of an injurious or disruptive nature.
After concluding that the Zoo was not liable under the ESA, the court dismissed with prejudice the entirety of Plaintiffs’ suit. Plaintiffs filed a timely appeal" from the district court’s judgment, and contest the court’s determination that the Zoo is not committing a taking. The Zoo filed a timely cross-appeal, and contests the court’s determinations that Plaintiffs have standing in this case and that the subject bears are grizzly bears protected by the ESA. The appeal and the cross-appeal were consolidated, and we possess jurisdiction to review them both pursuant to 28 U.S.C. § 1291.
*505 II.
We review a district court’s legal determinations, including its rulings as to whether a party possesses standing and its interpretations of regulations, de novo. See Wilson v. Dollar Gen. Corp., 717 F.3d 337, 342 (4th Cir. 2013) (standing); United States v. Boynton, 63 F.3d 337, 342 (4th Cir. 1995) (interpretation of regulations). We review a district court’s findings of fact for clear error. See Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 512 (4th Cir. 2002). ‘We review a district court’s discovery rulings, as .well as its decision to admit particular expert testimony, for abuse of discretion.” Bresler v. Wilmington Trust Co., 855 F.3d 178, 189 (4th Cir. 2017).
m.
As a threshold matter, we must determine whether Plaintiffs possess Article III standing to bring this suit against the Zoo. See United States v. Under Seal, 853 F.3d 706, 721 (4th Cir. 2017). We conclude that they do.
A.
To satisfy Article Ill’s standing requirements, a plaintiff must have “(1) suffered an injury in fact, (2) that is fairly traceable, to the challénged conduct of the defendant, and (3) that is likely to be redressed by a favorable- decision.” Spokeo, Inc. v. Robins, - U.S. -, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). “The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements.” Id.
B.
The district court held that Plaintiffs satisfied all three standing elements. We agree.
To begin, Plaintiffs’ claim that the Zoo is depriving them of a right to personally observe the Zoo’s bears living in a setting compatible with the ESA constitutes an aesthetic injury that satisfies the first standing element of injury in fact.
“To establish injury in fact, a plaintiff must show that he or she suffered ‘an invasion of a legally protected interest’ that is ‘concrete and particularized’ and ‘actual or imminent, not conjectural or hypothetical.’ ” Spokeo, 136 S.Ct. at 1548 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Courts frequently treat an aesthetic interest in the observation of animals as a legally protected interest. See Lujan, 504 U.S. at 562-63, 112 S.Ct. 2130 (explaining that “the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing”- (citing Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972))); Am. Soc’y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus, 317 F.3d 334, 337 (D.C. Cir. 2003) (concluding that “an injury in fact can be found when a defendant adversely affects a plaintiffs enjoyment of flora or fauna,, which the plaintiff wishes to enjoy again upon the cessation of the defendant’s actions”). When that interest is invaded in a real, non-speeulative, and personal manner, the requirement of an actual or imminent, concrete, and particularized injury is satisfied. See Spokeo, 136 S.Ct. at 1548-49 (explaining the concreteness and particularization conditions); see also Lujan, 504 U.S. at 563-64, 112 S.Ct. 2130 (rejecting plaintiffs’ claim that they suffered actual or imminent injury from government action that allegedly harmed endangered species living in foreign countries, because the plaintiffs only *506 expressed speculative “ ‘some day* intentions” to visit those countries).
In this case, Plaintiffs claim a strong interest in observing the Zoo’s bears living in conditions that do not violate the ESA. They explain, however, that they are precluded from observing the bears living in such conditions because the bears are currently being mistreated. Plaintiffs add that they are willing and able to go back and visit the bears if the conditions that the bears live in are improved. These claims, if true, are sufficient to establish injury in fact under the relevant precedent.
Importantly, the district court found Plaintiffs’ claims credible. The court defended its finding of injury by highlighting the “spiritual and cultural connection with the bears” that Plaintiffs, as members of the EBCI, possessed. Hill, 2016 WL 1251190, at *9. The court also cited definite statements by Plaintiffs confirming their intent to return to the nearby Zoo if the bears’ setting improved. See, e.g., id. at *3 (noting that Ms. Walker claimed she “certainly would go” to observe the bears if they were given a more humane setting); cf. Friends of the Earth, Inc. v. Laidlaw Envt’l Servs. (TOC), Inc., 528 U.S. 167, 184, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (holding that plaintiffs had standing to sue where they offered conditional statements that they would use a nearby river if the discharge of pollutants in the river ceased). The court recognized that Plaintiffs only observed the bears for fifteen to thirty minutes, but reasonably attributed their somewhat short observation time to the upsetting nature of the bear scene. Hill, 2016 WL 1251190, at *3. We discern no clear error in these sound credibility determinations.
Having found that Plaintiffs satisfy the injury in fact element, the second and third standing elements easily follow. The Zoo is maintaining its bears in the setting that Plaintiffs complain of, and so Plaintiffs’ alleged aesthetic injury is fairly traceable to the Zoo. Finally, Plaintiffs claim that they are being deprived of a right to observe the bears living in a setting that does not violate the ESA, and this can be redressed by an injunction directing the Zoo to maintain its bears in such a setting.
IV.
A.
Secure in the justiciability of this case, we now consider whether the bears in this case are grizzly bears protected by the ESA. We agree with the district court’s determination that Plaintiffs have proven that the subject bears are indeed grizzly bears.
The district court’s determination is corroborated by several pieces of evidence whose admission is not contested on appeal. These include the Zoo’s online representations, signs, and veterinary records— as well as USDA reports—that collectively identify the subject bears as grizzly bears. Hill, 2016 WL 1251190, at *3-4.
The district court’s determination is also corroborated by trial testimony from Plaintiffs’ expert, Dr. Ramsay, who identified the subject bears as grizzly bears based on his observation of distinctive shoulder humps on the bears. Id. at *5.
The district court’s determination, moreover, was reached after sensibly rejecting the Zoo’s contrary evidence. The court acknowledged Ms. Coggins’s claim that the subject bears were referred to as grizzly bears simply for promotional purposes, but found her testimony in that matter “not credible” in light of the Zoo’s representations to the USDA that those bears are grizzly bears. Id. The court also acknowledged that the Zoo’s veterinarian, Dr. Ack-erman, had testified that the subject bears *507 are European brown bears, but concluded that this testimony was undermined by contrary representations in his veterinary certifications. Id. These are well-reasoned credibility determinations that we are unwilling to disturb. See F.T.C. v. Ross, 743 F.3d 886, 894 (4th Cir. 2014) (“In cases in which a district court’s factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference [than usual].” (internal quotation marks omitted)).
In sum, the district court was entirely justified in concluding that the subject bears are grizzly bears, and are therefore protected by the ESA.
B.
Nonetheless, the Zoo contests the district court’s determination that the subject bears are grizzly bears on the grounds that—in the Zoo’s view—Dr. Ramsay’s expert identification was improperly admitted. The basis for the Zoo’s challenge to Dr. Ramsay’s expert identification is that this evidence was not cited in the disclosure report produced by Plaintiffs and Dr. Ramsay pursuant to Rule 26 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 26(a)(2)(B)® (requiring parties to disclose “complete statement of all opinions the [expert] witness will express and the basis and reasons for them”). The district court acknowledged this issue, but reasoned that Plaintiffs’ Rule 26 violation was harmless. See Hill, 2016 WL 1251190, at *4 n.6. We affirm.
“District courts are accorded ‘broad discretion’ in determining whether a party’s nondisclosure or untimely disclosure of evidence is substantially justified or harmless.” Bresler, 855 F.3d at 190 (quoting Wilkins v. Montgomery, 751 F.3d 214, 222 (4th Cir. 2014)). In making this determination, a district court should be guided by the five Southern States factors:
(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party’s explanation for its failure to disclose the evidence.
S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). “The first four factors ... relate primarily to the harmlessness exception, while the last factor, addressing the party’s explanation for its nondisclosure, relates mainly to the substantial justification exception.” Bresler, 855 F.3d at 190.[2]
Regarding the first factor, the Zoo had prior notice of Dr. Ramsay’s opinion that undermines its claim of unfair surprise. Dr. Ramsay stated that the appearance of the bears was consistent with that of grizzly bears in a declaration in support of Plaintiffs’ April 30, 2015, opposition to the Zoo’s motion for summary judgment. He provided his expert identification of the bears at the bench trial almost five months later in late September 2015.
As for the second factor, the district court gave the Zoo an opportunity to designate additional expert witnesses in response to the Zoo’s concerns about timing. The Zoo therefore had an opportunity to mitigate the effect of any unfair surprise. *508 Although the Zoo decided not to avail itself of this opportunity, we cannot fault Plaintiffs for this independent decision made by the Zoo.
With respect to the third factor, Dr. Ramsay’s expert identification cannot fairly be labeled a trial disruption. This identification only addressed the discrete point of whether or not the subject bears are grizzly bears. It did not “interject an additional, and considerably complex, legal theory” into the case, nor did it “substantially change the character of the case and render obsolete much of the parties’ trial preparation,” Rambus, Inc. v. Infineon Tech. AG, 145 F.Supp.2d 721, 730 (E.D. Va. 2001).
Moving' on to the fourth factor, Dr. Ramsay’s expert identification was admittedly important in that it helped establish a prerequisite to Plaintiffs’ claims' for relief. The importance of this identification is somewhat diminished, however, given that Plaintiffs had already proffered considerable, independent evidence establishing that prerequisite.
Finally, with regards to the fifth factor, we assume for the- sake of argument that Plaintiffs lacked an adequate explanation for their discovery violation. As noted above, however, this factor is primarily related to the substantial justification exception, and so it sheds, little light on the harmlessness exception under consideration here.
In sum, the factors most relevant to the harmlessness inquiry weigh in favor of, or are at least neutral in regards to, the admission of Dr. Ramsay’s expert identification. As such, the district court did not abuse its broad discretion in excusing Plaintiffs’ non-compliance with Rule 26.on harmlessness grounds.[3]
V.
We now turn to the heart of this case— the question of whether the district court correctly held that the Zoo did not engage in an unlawful taking of its captive .grizzly bears. As explained below, we conclude that this holding was the result .of incorrect legal analysis; we consequently vacate this holding and remand this case to the district court for further consideration.
A.
The ESA prohibits the “tak[ing]” of any endangered or threatened species, 16 U.S.C. § 1538(a)(1)(B), and makes it unlawful to possess any endangered or threatened species that has been unlawfully “taken,” id. § 1538(a)(1)(D). Grizzly bears in the lower forty-eight states are considered threatened species. 50 C.F.R. § 17.11(h).
The ESA expansively defines the term “take” as “to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to-engage in any such conduct.” -16 U.S.C. § 1532(19). Plaintiffs contend that the manner in which the Zoo maintains its bears constitutes harassment and harm' proscribed by the ESA. We consider each claim in turn,
*509 . B. ' .
1.
We begin by addressing Plaintiffs’ harassment claim. The Fish and Wildlife Service (FWS) of the’U.S. Department of the Interior defines “[h]arass” as “an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering.” 50 C.F.R. § 17.3. This ■ regulatory definition •contains certain exclusions: ■
This definition, when applied- to captive wildlife, does not include generally accepted:
(1) Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the [AWA], '
(2) Breeding procedures, or
(3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife.
Id. (emphasis added). (The Secretary of Agriculture is responsible for promulgating facilities and care standards under the above-referenced AWA, See 7 U.S.C. § 2143(a); see also People for the Ethical Treatment of Animals v. United States Dep’t of Agric., 861 F.3d 502, 505 n.1 (4th Cir. 2017) (“The [AWA] authorizes the Secretary of Agriculture, who falls within the USDA, to administer the Act”).
At issue in this case is the proper interpretation of the first enumerated ex-elusion.[4] The district court interpreted this exclusion to excuse animal husbandry practices that are compliant with applicable AWA standards, without regard to whether those practices are “generally accepted.” Plaintiffs urge us to reject this interpretation, explaining that the exclusion can. only fairly be interpreted to excuse animal husbandry practices- that are both (1) “generally accepted” and (2) AWA compliant. We agree with Plaintiffs’ position on this matter. ' ;■
Plaintiffs’ interpretation necessarily follows' from the relevant regulatory text. The first enumerated exclusion specifically requires AWA compliance, and it is preceded by a “generally accepted” requirement that applies to the disjunctive list of enumerated exclusions. It is therefore clear that the first enumerated exclusion is comprised of both a “generally accepted” requirement and an AWA compliance requirement.
The district court’s contrary interpretation renders meaningless the phrase “generally , accepted” in 50 C.F.R. § 17.3. It therefore conflicts with basic principles of legal interpretation. See TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (“It is a cardinal principle of statutory [and regulatory] construction that a. statute [or regulation] ought, upon the whole, to be. so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.” (internal quotation marks-omitted)).[5]
Moreover, by reading the “generally accepted” requirement out of the first enu *510 merated exclusion from 50 C.F.R. § 17.3’s definition of harass, the district court narrows the scope of what constitutes harassment and, by extension, the scope of what constitutes a proscribed taking of protected animals under the ESA. The district court’s interpretation also makes it so that the first enumerated exclusion is necessarily satisfied whenever a defendant complies with the Secretary of Agriculture-administered AWA. This protection-narrowing, Secretary of Agriculture-centered outcome is in tension with what the Supreme Court has explained Congress had in mind in enacting the ESA: a “broad purpose to protect endangered and threatened wildlife,” which was to be advanced in large part through “broad administrative and interpretive power [delegated] to the Secretary [of the Interior].” Babbitt v. Sweet Home Chapter of Cmtys, for a Great Oregon, 515 U.S. 687, 700, 708, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (citing 16 U.S.C. §§ 1533, 1540(f)).
The impropriety of treating as meaningless the “generally accepted” language in 50 C.F.R. § 17.3 is especially apparent when one considers the entire set of exclusions impacted by that language. Specifically, the second enumerated exclusion from 50 C.F.R. § 17.3’s definition of harass excuses “generally accepted ... [breeding procedures.” If the phrase “generally accepted” was deemed meaningless, then we would end up with the absurd result whereby all breeding procedures—from the benign to the cruel—would fall outside the scope of the regulatory definition of harass. This cannot be so. See Chesapeake Ranch Water Co. v. Bd. of Comm’rs of Calvert Cty., 401 F.3d 274, 280 (4th Cir. 2005) (cautioning against interpretations of text that lead to “an absurd conclusion”) (quoting In re Chapman, 166 U.S. 661, 667, 17 S.Ct. 677, 41 L.Ed. 1154 (1897)).
2.
Having rejected the district court’s interpretation of the first enumerated exclusion from 50 C.F.R. § 17.3’s definition of harass, we now address the appropriate disposition for this case.
To establish harassment in this case, Plaintiffs must prove (1) that the Zoo’s animal husbandry practices fall within 50 C.F.R. § 17.3’s definition of harass, and (2) that those practices do not fall within the first enumerated exclusion from that definition. The first issue remains unresolved because the district court did not reach it. The second issue remains unresolved in light of our holding that the district court improperly declined to ask whether the Zoo’s animal husbandry practices are “generally accepted” before it invoked the first enumerated exclusion.[6]
It is therefore appropriate to remand this case to the district court to resolve these issues in the order of its choosing. See Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (“It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.”). We add that if the district court rules against Plaintiffs on one of these issues, then it need not reach the other issue, because Plaintiffs must prevail on both issues in order to establish ESA liability.
C.
In addition to challenging the district court’s rejection of its claim that the Zoo engaged in a taking by harassing the grizzly bears, Plaintiffs also briefly challenge *511 the court’s rejection of its claim that the Zoo engaged in a taking by harming the grizzly bears. We reserve judgment on this challenge.
We do so as a result of the unique posture of this case. To elaborate, the regulatory definition of harass contains requirements that are less demanding for Plaintiffs—whose suit centers on behavioral interference evidence—than are the requirements contained in the regulatory definition of harm.[7] Therefore, we believe it is prudent to grant the district court an opportunity to address the application of the regulatory definition of harass in the first instance before we review the difficult question of the application of the regulatory definition of harm. This course of action is especially appropriate in light of the fact that the parties’ appellate briefs focused primarily on analyzing harassment, not harm. Cf. Goldfarb v. Mayor & City Council of Baltimore, 791 F.3d 500, 515 (4th Cir. 2015) (reserving judgment on a question outside of what the “appellate briefs centered on,” in a case that was being remanded to the district court).
VI.
For the foregoing reasons, we affirm the district court’s determinations that Plaintiffs have standing in this case and that the subject bears are grizzly bears.
We conclude, however, that the district court’s determination that the Zoo is not committing a taking was based on incorrect legal analysis. We therefore vacate that determination and remand this case fer further proceedings consistent with this opinion.

AFFIRMED IN PART; VACATED IN PART AND REMANDED

. Dr. Ramsay’s expert identification is complicated by the fact that Plaintiffs did not cite this evidence in the appropriate disclosure documents. With that said, Dr. Ramsay stated that the appearance of the subject bears was consistent with that of grizzly bears in a declaration in support of Plaintiffs’ April 30, 2015, opposition to the Zoo’s motion for summary judgment. Moreover, the district court— in response to Plaintiffs’ disclosure violation—appears to have given the Zoo an opportunity to designate additional expert witnesses, an opportunity that the Zoo declined. See Reply Br. at 16.

. We recognize that the district court did not explicitly address the Southern States factors. Even so, "the district court was not required to tick through each of the Southern States factors. Southern States explains that district courts have ‘broad discretion’ to decide harmlessness and ‘should’'—not ‘shall’—‘be guided by’ the five factors.” Wilkins, 751 F.3d at 222 (quoting S. States, 318 F.3d at 597).

. The Zoo raises additional challenges to other evidentiary decisions by the district court, • but we decline to address them. The uncontested evidence and Dr, Ramsay's expert identification constitute overwhelming evidence that the subject bears are grizzly bears, such that the Zoo could not possibly have been prejudiced by the arguably improper admission of any additional evidence confirming that point. See Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292, 314 (4th Cir. 2012) (per curiam) ("Rule 61 [of the Federal Rules of Civil Procedure] directs courts to disregard any error, or defect in the proceeding unless the error is prejudicial: It must have affected the outcome of the district court proceedings.” (internal quotation marks omitted)).

. Although the Zoo has complained about the clarity of the first enumerated exclusion, we note that it does not challenge the validity of this exclusion or any other feature of 50 C.F.R. § 17.3. Thus, this is strictly a case about regulatory interpretation.

. "We normally construe regulations using the same rules we employ to construe statutes.” Harris v. Norfolk S. Ry. Co., 784 F.3d 954, 962 (4th Cir. 2015).

. As for the district court’s finding that the Zoo’s animal husbandry practices satisfy the AWA compliance requirement of the first enumerated exclusion, we accept that finding as true, because Plaintiffs have not contested it on appeal.

. Compare 50 C.F.R. § 17.3 (defining "[Harass" as “an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering”) with id. (defining "Harm” as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering”).