<u>**PUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1975

CHARLES EUGENE HARRIS,

        Plaintiff - Appellee,

    v.

NORFOLK SOUTHERN RAILWAY COMPANY,

        Defendant – Appellant,

    and

NORFOLK SOUTHERN RAILWAY CORPORATION,

        Defendant,

    v.

COBRA NATURAL RESOURCES, LLC; SPERRY RAIL, INCORPORATED, d/b/a Sperry Rail Services,

        Third Party Defendants.

No. 13-2026

CHARLES EUGENE HARRIS,

        Plaintiff - Appellant,

    v.

NORFOLK SOUTHERN RAILWAY COMPANY,

        Defendant – Appellee,

and

NORFOLK SOUTHERN RAILWAY CORPORATION,

> Defendant,

> v.

COBRA NATURAL RESOURCES, LLC; SPERRY RAIL, INCORPORATED, d/b/a Sperry Rail Services,

> Third Party Defendants.

---

Appeals from the United States District Court for the Southern District of West Virginia, at Charleston.  Joseph R. Goodwin, District Judge.  (2:11-cv-00497)

---

Argued:  December 10, 2014          Decided:  April 30, 2015

---

Before TRAXLER, Chief Judge, and KEENAN and THACKER, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion.  Chief Judge Traxler wrote the opinion, in which Judge Keenan and Judge Thacker joined.

---

**ARGUED:** John Harlan Mahaney, II, HUDDLESTON BOLEN, LLP, Huntington, West Virginia, for Appellant/Cross-Appellee.  Bruce E. Stanley, REED SMITH, LLP, Pittsburgh, Pennsylvania, for Appellee/Cross-Appellant.  **ON BRIEF:** T. Matthew Lockhart, David C. Kiebler, HUDDLESTON BOLEN, LLP, Huntington, West Virginia, for Appellant/Cross-Appellee.  Colin E. Wrabley, Timothy L. Moore, Douglas C. Allen, M. Patrick Yingling, REED SMITH LLP, Pittsburgh, Pennsylvania; Tonya L. Hatfield, Inez, Kentucky, for Appellee/Cross-Appellant.

---

TRAXLER, Chief Judge:

Norfolk Southern Railway Company ("Norfolk Southern") appeals a district court order granting summary judgment against it on the issue of liability in a negligence action brought by Charles Harris, who seeks compensation for injuries he suffered as the result of a train derailment. Harris cross-appeals the district court's order granting summary judgment against him on his claim for punitive damages. We affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.

I.

On the morning of July 21, 2009, Harris was working on the second floor of the Black Bear Preparation Plant, a seven-story coal-loading facility (the "loadout") in Mingo County, West Virginia. Harris's employer, Cobra Natural Resources ("Cobra"), owned and operated the loadout, and Norfolk Southern owned and operated the train and owned the track involved in this case. On that morning, Norfolk Southern employees backed an empty train of freight rail cars over an area of the Ben Creek Spur railroad track, which ran underneath the loadout where Harris was working. Unbeknownst to anyone, a section of the rail approximately 35 feet from the loadout was heavily corroded and contained cracks between the rail head (the ball of the rail) and the web (the vertical part of the rail). When the rail cars

3

passed over this portion of the damaged track, a section of the rail head separated from the web and several cars derailed. One of the cars crashed into the loadout's support beams, precipitating the collapse of the loadout and causing Harris debilitating physical and mental injuries. An investigation into the derailment revealed that the head separation extended over nine feet of track. The summary-judgment evidence indicates that most of the separation occurred months or years before and that the derailment occurred when the final piece of webbing broke away from the rail head.

Central to this appeal are issues concerning what obligations Norfolk Southern had to inspect the track and maintain it, whether Norfolk Southern should have discovered the defect and taken action prior to the accident, and proximate cause.

Regarding the defect's progression, cracks going all the way through the rail had run along the length of a nine-foot section between the rail head and the web for a lengthy period of time before the derailment. An extreme level of corrosion along the break of the rail confirmed that the rail had been damaged for several years. Indeed, Norfolk Southern's own expert, Brett Pond, testified that of the hundreds of cracked, broken, or corroded rails he had examined in his career, this one was "the worst [he'd] ever seen." J.A. 1246.

4

Norfolk Southern's duty to inspect the rail arises from the Federal Rail Safety Act ("FRSA"), see 49 U.S.C. § 20101, et seq. Congress enacted the FRSA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. To achieve this goal, Congress authorized the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety." Id. § 20103(a). Accordingly, acting through the Federal Railroad Administration ("FRA"), the Secretary created comprehensive track safety standards ("TSS") that govern the maintenance, repair, and inspection of tracks. See 49 C.F.R. Part 213; Duluth, Winnipeg & Pac. Ry. Co. v. City of Orr, 529 F.3d 794, 796 (8th Cir. 2008).

Several parts of the TSS, as they existed on the date of the accident, are relevant to this appeal. Section 213.1 of Title 49 of the Code of Federal Regulations states that the TSS

> prescribe[] minimum safety requirements for railroad track that is part of the general railroad system of transportation. The requirements prescribed in this part apply to specific track conditions existing in isolation. Therefore, a combination of track conditions, none of which individually amounts to a deviation from the requirements in this part, may require remedial action to provide for safe operations over that track. This part does not restrict a railroad from adopting and enforcing additional or more stringent requirements not inconsistent with this part.

5

49 C.F.R. § 213.1(a) (2009). Subparts B through E of section 213 prescribe minimum requirements for "roadbed and areas immediately adjacent to roadbed" (Subpart B), "the gage, alinement, and surface of track, and the elevation of outer rails and speed limitations for curved track" (Subpart C), "ballast, crossties, track assembly fittings, and the physical conditions of rails" (Subpart D), and "certain track appliances and track-related devices" (Subpart E).  49 C.F.R. §§ 213.31, .51, .101, .201 (2009).

Under the TSS, different classes of track have different maximum speeds and different maintenance and inspection requirements.  See 49 C.F.R. §§ 213.9, .233-.369 (2009). Section 213.233 governs inspections of Class 1-5 tracks, of which the Ben Creek Spur is Class 2, see J.A. 2034, 2105.  The regulation requires that inspections be made "by a person designated under [49 C.F.R.] § 213.7,"[1] but it provides very few specific limitations concerning how inspections must be conducted.  49 C.F.R. § 233(a).  It requires that they "be made on foot or by riding over the track in a vehicle at a speed that allows the person making the inspection to visually inspect the track structure for compliance with this part."  49 C.F.R.

---

[1] As is relevant here, § 213.7 requires the designee to have particular levels of experience, knowledge, and ability in certain areas.  See 49 C.F.R. § 213.7 (2009).

6

§ 213.233(b). For an inspection made from a moving vehicle, the vehicle's speed is left to "the sole discretion of the inspector, based on track conditions and inspection requirements," except that vehicles may not exceed "[five] miles per hour when passing over track crossings and turnouts." Id. The regulation even allows for a single inspector in a vehicle to simultaneously inspect two tracks 30 feet apart or for two inspectors in a vehicle to simultaneously inspect four tracks that are no more than 39 feet from the track over which their vehicle is travelling, so long as certain requirements are met.[2] Because the Ben Creek Spur is Class 2, inspections are required only weekly. See 49 C.F.R. § 233(c)[3]. If an inspector conducting a § 213.233 inspection "finds a deviation from the

---

[2] Simultaneous inspections of multiple tracks from a moving vehicle can be valid only if "the inspector's visibility remains unobstructed by any cause," 49 C.F.R. § 213.233(b)(1), (2), a requirement that does not apply to inspections of a single track. Also, except for certain high density commuter railroad lines, each main track must be "actually traversed by the vehicle or inspected on foot at least once every two weeks, and each siding [must be] actually traversed by the vehicle or inspected on foot at least once every month." 49 C.F.R. § 213.233(b)(3).

[3] For excepted track, and track of Class 1, 2, or 3, the main track and sidings must be inspected weekly with at least three calendar days between inspections, while track other than main track or sidings must be inspected monthly with at least 20 calendar days interval between inspections. See 49 C.F.R. § 213.233(c).

7

requirements of [the TSS], the inspector shall immediately initiate remedial action." 49 C.F.R. § 213.233(d).

Section 213.113(a) provides specific additional requirements that apply when a track owner learns of the presence of specified defects occurring in a rail, as opposed to other parts of the track structure. In that event, a person designated under 49 C.F.R. § 213.7 must "determine whether or not the track may continue in use." 49 C.F.R. § 213.113(a) (2009). Even "[i]f he determines that the track may continue in use, operation over the defective rail is not permitted until" either the rail is replaced, or particular remedial action specified in the regulation for particular defects is initiated. Id.

Section 213.5(a) also provides more generally that a track owner "who knows or has notice that the track does not comply with the requirements of this part, shall" either bring the track into compliance, cease operations over the track, or operate the track under authority of a person designated under § 213.7(a) with at least one year of supervisory experience concerning railroad track maintenance, subject to specified conditions. 49 C.F.R. § 213.5(a) (2009) (emphasis added).

In this case, Norfolk Southern's inspectors inspected the Ben Creek Spur weekly in the months prior to the July 21, 2009, accident. During that time they discovered some defects, but

8

they did not discover the rail defect that eventually caused the derailment. Within about 100 feet from the loadout in either direction, including where the defective rail was located, the track area was covered with coal, dirt, and debris such that only the head of the rail could be seen. The web of the rail, the ties, and the ballast were not visible, even by an inspector walking beside the track. Especially considering the extreme level of corrosion that was present on the web of the rail in the affected area for months or years prior to the accident, there is no question that without this debris, the damage to the rail would have been apparent to any inspector actually looking at the web and the complete underside of the rail head of the defective section of track.

Christopher Carney, who was serving Norfolk Southern as Division Engineer at the time of the accident, testified extensively in his deposition regarding Norfolk Southern's inspections. Carney testified that the inspectors inspected the Ben Creek Spur in several ways. First, they conducted on-foot inspections. They would also ride a geometry car, which railroads generally use to test the track's smoothness, position, curvature, and alignment, as well as the crosslevel of the two rails. See generally 49 C.F.R. Part 213, Subpart C (governing track geometry). And they would make "high rail inspections," J.A. 1955, during which they traversed the rail in

a vehicle but alighted to make closer inspections when needed. He testified that eight to twelve miles per hour was a good speed for visual inspections of the Ben Creek Spur, except for when riding over road crossings or going across turnouts, where the maximum speed would be five miles per hour.  See 49 C.F.R. § 233(b).

Carney testified that the coal spillage on the Ben Creek loadout area "was no different than you would see at any of the other loadouts on the Norfolk Southern line" for which Carney was responsible.  J.A. 2011.  He stated that he was not aware of any FRA rule prohibiting the presence of coal debris around the track structure during inspections, and he was satisfied that he could adequately inspect the track without having the tracks cleared.  He testified that inspectors are trained to look for "telltale signs" of head/web separation even when snow or other material covering the track prevents them from seeing underneath the ball of the rail.  J.A. 1969, 2030.  For example, the rail's profile "can have a dip in it," there can be depressions in the coal or other material, or the rail head may "appear more blackened."  J.A. 1969, 1971; see also J.A. 1974–75 ("[I]f you are in a truck, you are still going to look at the profile of the rail to see if you see any dips, any change in the profile . . . of the rail.").  Any of these indicators might prompt an inspector to get out of his vehicle to make a closer

10

examination, although Carney noted that these indicators are not always present.[4]

Carney noted that the corrosion that might be associated with a head/web separation is "[o]n the web of the rail typically" but can "also be on the bottom of the rail." J.A. 1970. He noted that because "a head/web separation is on the underside of the rail," "you are not going to see [it] from looking down," although sometimes inspectors can see signs indicating that a defect exists. J.A. 1970-71.

Norfolk Southern Track Supervisor Jack Stepp testified that there would often be coal piled up on the track such that he and Assistant Track Supervisor Ricky Lee both would need to shovel it out just to get their vehicle down the track to conduct their inspections. Stepp noted that the presence of coal "makes it hard" to conduct required inspections. J.A. 1296. Lee confirmed the problem and also testified that although Cobra "did from time to time do a little bit of cleaning" of the tracks, it was "not really good enough." J.A. 1319; see also J.A. 1326 ("[W]e couldn't get [Cobra] to [clean the track] very well, but they did make an attempt from time to time.").

---

[4] Carney also testified that if inspecting on foot, one would look for "any lateral movement of the rail," which "would indicate that the ball was separated." J.A. 1975.

11

In addition to inspecting the track visually, Norfolk Southern contracted with Sperry Rail Services ("Sperry") to conduct ultrasonic internal rail defect testing. Carney testified that Sperry's ultrasonic search for internal defects was actually a more effective way to search for such defects than inspecting the track structure visually. Norfolk Southern had Sperry test the relevant section of track in October 2006 and October 2007 and intended for Sperry to test it again in February 2009. However, unbeknownst to Norfolk Southern at the time, Sperry's February 2009 testing apparently did not include the relevant section.[5] There is no dispute that considering the seriousness of the defect, ultrasonic testing of the relevant area should have revealed the defect.

Following the July 2009 derailment, Harris brought this lawsuit in state court against Norfolk Southern, alleging that Norfolk Southern was negligent in various respects under state law, and seeking compensatory and punitive damages. As is relevant to the current appeal, Harris claimed that Norfolk

---

[5] In answers to interrogatories, Norfolk Southern stated that "it appears that Sperry" did not test the portion of the rail that caused the derailment. J.A. 1536. However, Norfolk Southern Track Supervisor Stepp, who was on the Sperry truck that was conducting the 2009 testing, testified that he believed they had traversed the rail in question. No allegation of negligence is made by Harris against Norfolk Southern regarding the failure of Sperry to conduct the ultrasonic testing.

12

Southern negligently failed to adequately inspect and maintain its tracks.

Norfolk Southern removed the case to federal district court on the basis of diversity jurisdiction, and it subsequently asserted third-party claims against Cobra and Sperry for indemnity. Sperry in turn asserted counterclaims against Norfolk Southern and cross-claims against Cobra, which also filed cross-claims against Sperry. The claims by and against Sperry were eliminated by a partial settlement and a later partial dismissal order. Norfolk Southern subsequently filed an amended third-party complaint against Cobra, asserting indemnity under two separate agreements.

Norfolk Southern also filed an answer to Harris's complaint. In the answer, Norfolk Southern asserted as an affirmative defense the contention that the FRSA preempts Harris's claims.[6] Following discovery, Norfolk Southern and Harris filed cross-motions for summary judgment.

On the merits of the track inspection and maintenance claims, Harris argued that the record established as a matter of law that because the rails on the Ben Creek Spur were constantly covered by debris, dirt, and coal, Norfolk Southern could not

---

[6] The district court ruled that Harris's claims were not preempted to the extent Harris alleged violations of federal standards of care under 49 C.F.R. § 213.1(a), 213.5(a), and 213.233, a conclusion the parties do not contest on appeal.

have conducted its inspections required by § 213.233. Harris also argued that, as a matter of law, Norfolk Southern knew or should have known that the rail was no longer in compliance with the TSS. Thus, Harris maintained, Norfolk Southern was legally obligated to undertake the measures § 213.5 prescribed.

In contrast, Norfolk Southern maintained that § 213.233 created no duty to clear the debris from its tracks in order to conduct its required inspections. It also contended that it had no knowledge or notice of the rail defect prior to the derailment.

The district court concluded that the record established as a matter of law that Norfolk Southern violated its duty to visually inspect the track structure pursuant to 49 C.F.R. § 213.233 because the area around the loadout was covered with debris, dirt, and coal during the inspections Norfolk Southern attempted. See Harris v. Norfolk S. Ry. Corp., 2012 WL 6209164, at *11-13 (S.D. W. Va. Dec. 13, 2012). The court further ruled that the record established as a matter of law that Norfolk Southern was responsible for the injuries caused by the defective rail because the railroad "kn[ew] or ha[d] notice" of the rail defect, 49 C.F.R. § 213.5(a), insofar as "the evidence . . . establishes that the broken rail had existed for some time." Harris, 2012 WL 6209164, at *13. Accordingly, although the court ruled that Harris failed to even create a genuine

14

issue of fact on his other liability theories (which are not relevant to this appeal), the court granted partial summary judgment to Harris on the issue of whether Norfolk Southern's negligence caused the derailment. See id. at *13-16, 18. The court, however, granted summary judgment against Harris on his claim for punitive damages, noting that "[t]he only real evidence here is that [Norfolk Southern] may have failed to comply with federal regulations, which resulted in injuries to the plaintiff" and "I [find] that there is insufficient evidence to support a claim for punitive damages in this case." Id. at *16.

The case then proceeded to a jury trial on the issue of Harris's compensatory damages. After two days of testimony, the jury awarded Harris $2,977,383, which included $2,000,000 for pain and suffering and loss of enjoyment of life, $795,183 for lost earnings, $125,000 for loss of household services, and $57,200 for medical expenses. Norfolk Southern subsequently moved unsuccessfully for a new trial or alternatively a remittitur, for reasons we will discuss. See Harris v. Norfolk S. Ry., 2013 WL 896194, at *3-4 (S.D. W. Va. Mar. 8, 2013).

Norfolk Southern later resolved certain of its claims against Cobra, and the district court subsequently entered a final judgment resolving all claims pursuant to Federal Rule of Civil Procedure 54(b).

II.

Norfolk Southern argues that the district court erred in granting summary judgment to Harris on the issue of Norfolk Southern's liability for the accident. We agree.[7]

"We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." T-Mobile Ne. LLC v. City Council of Newport News, 674 F.3d 380, 384–85 (4th Cir. 2012) (internal quotation marks omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A critical aspect of this appeal involves interpreting federal regulations. We normally construe regulations using the same rules we employ to construe statutes. See, e.g., Gilbert v. Residential Funding LLC, 678 F.3d 271, 276 (4th Cir. 2012). If the regulation's language "has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written." Id. (internal quotation marks omitted). If a

_____

[7] We have appellate jurisdiction under 28 U.S.C. § 1291 in light of the district court's Rule 54(b) certification of final judgment.

16

regulation is ambiguous, however, "then we look beyond the plain language, examining regulatory intent and overall [regulatory] construction." Qwest Corp. v. Colorado Pub. Utils. Comm'n, 656 F.3d 1093, 1099 (10th Cir. 2011) (alteration and internal quotation marks omitted). An agency's interpretation of a regulation it administers is accorded controlling deference so long as the interpretation is not contrary to the regulation or law that authorized the regulation. See Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2166 (2012).

The claim at issue in this appeal is Harris's state-law negligence, personal-injury cause of action, which requires Harris to prove the typical "four basic elements: duty, breach, causation, and damages." Hersh v. E-T Enters., Ltd. P'ship, 752 S.E.2d 336, 341 (W. Va. 2013). The FRSA's preemption provision does not prevent a state-law action seeking damages for personal injury based on an allegation that the defendant "has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation . . . covering" laws, regulations, and orders related to railroad safety. 49 U.S.C. § 20106(b)(1)(A). Before us in this appeal are two allegations concerning violations of federal standards of care. First is Harris's allegation that Norfolk Southern breached its duty to conduct visual inspections in accordance with 49 C.F.R. § 213.233. Second is Harris's allegation that

17

Norfolk Southern breached its duty to take the measures 49 C.F.R. § 213.5(a) requires a track owner to take when it knows or has notice that its track is out of compliance with the TSS.

For the following reasons, we conclude that Harris has not established Norfolk Southern's liability as a matter of law under either theory. More specifically, while we agree that Harris has established that Norfolk Southern breached its duty to properly inspect the track under the TSS, a genuine issue of material fact exists as to whether Norfolk Southern's breach proximately caused the derailment and Harris's injuries.

A.

In order to evaluate Harris's claims that Norfolk Southern breached the duties imposed upon it by the TSS, we must first determine the scope of those duties. We begin with the duty imposed by 49 C.F.R. § 213.5.

Under § 213.5, a track owner "who knows or has notice that the track does not comply with the requirements of this part" must either bring the track into compliance, cease operations on the track, or operate the track under authority of a person designated under § 213.7(a) with at least one year of supervisory experience concerning railroad track maintenance, subject to specified conditions. 49 C.F.R. § 213.5(a)(1)-(3).

Norfolk Southern does not dispute that the record establishes as a matter of law that the rail had been out of

18

compliance with the TSS for months or years prior to the derailment. However, it argues that a genuine factual issue existed regarding whether it knew or had notice that the track was out of compliance with the TSS, and thus, whether its duty to address the defect under § 213.5 was ever triggered.

Resolving the issue of whether a genuine factual dispute existed regarding whether Norfolk Southern "kn[e]w[] or ha[d] notice" of the defective rail requires us to also determine whether the "notice" required under § 213.5(a) is actual notice, constructive notice, or both. In its commentary to the 1998 amendments to the TSS, the FRA states its view that that standard holds owners liable "only for those defects about which they know or should know." Federal Railroad Administration, Track Safety Standards, 63 Fed. Reg. 33,992-01, 33,995 (June 22, 1998); see id. ("With a knowledge standard attached to the track regulations, railroads are held liable for non-compliance or civil penalties for only those defects that they knew about or those that are so evident the railroad is deemed to have known about them."); "Track and Rail and Infrastructure Integrity Compliance Manual" (2014), at 2.1.10, viewed at http://www.fra.dot.gov/eLib/details/L04404 (last visited Mar. 23, 2015) (providing that § 213.5 "describes the action that must be taken by a railroad or track owner once they know or have notice (knowledge standard) that the track is not in

19

compliance with the TSS") (saved as ECF opinion attachment). The commentary explains that this standard "is unique to the track regulations" in that "other FRA regulations are based on strict liability." 63 Fed. Reg. at 33,995. It explains that the "standard is founded on the notion that railroads cannot prevent the occurrence of some defects in track structures that are continually changing in response to the loads imposed on them by traffic and effects of weather." Id. The commentary acknowledges that, for this reason, "[m]any defects may not be detected even when the track owner exercises reasonable care." Id.

The commentary also explains that under the applicable standard, railroads may be responsible for defects that FRA and state inspectors have found and alerted the railroad to, as well as those defects that a railroad's own inspectors have found. See id. at 33,995-96. But, the commentary explains that even when inspectors have not uncovered a problem, railroads may also be responsible for a defect that "is of the nature that it would have had to exist at the time of the railroad's last inspection (for example, defective crossties or certain breaks that are covered with rust) and would have been detected with the exercise of reasonable care." Id. at 33,996. The existence of a defect of this type "constitutes constructive knowledge by the railroad." Id.

20

Norfolk Southern maintains that § 213.5's requirement that a railroad address defects of which it "knows or has notice" plainly was limited to those defects of which it has actual knowledge, and thus that the FRA's reading is unreasonable and not entitled to deference. In our view, Norfolk Southern's position ignores the "or has notice" language in the regulation. A railroad has constructive notice of a condition that it would have discovered had it exercised reasonable care, and the FRA's interpretation appropriately reflects that. See Black's Law Dictionary 1062 (6th ed. 1990) ("Constructive notice is information or knowledge of a fact imputed by law to a person (although he may not actually have it), because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it.").

In response to the contention that it is ignoring the "or has notice" language in the regulation, Norfolk Southern points to a different regulation, 49 C.F.R. § 213.113, which was amended in 2014. The regulation, as amended, provides, in relevant part:

> (a) When an owner of track learns that a rail in the track contains any of the defects listed in the table contained in paragraph (c) of this section, a person designated under § 213.7 shall determine whether the track may continue in use. If the designated person determines that the track may continue in use, operation over the defective rail is not permitted until--

21

(1) The rail is replaced or repaired; or

(2) The remedial action prescribed in the table contained in paragraph (c) of this section is initiated.

(b) When an owner of track learns that a rail in the track contains an indication of any of the defects listed in the table contained in paragraph (c) of this section, the track owner shall verify the indication. The track owner must verify the indication within four hours, unless the track owner has an indication of the existence of a defect that requires remedial action A, A2, or B identified in the table contained in paragraph (c) of this section, in which case the track owner must immediately verify the indication. If the indication is verified, the track owner must--

(1) Replace or repair the rail; or

(2) Initiate the remedial action prescribed in the table contained in paragraph (c) of this section.

49 C.F.R. § 213.113 (2014) (emphasis added).

Norfolk Southern notes that under the amended regulation a track owner's learning of an indication of a rail defect leads to a further specific duty on the part of the owner to verify the defect. Norfolk Southern suggests that § 213.113 as amended, whose obligations are triggered based on what owners actually learned rather than on what they should have learned, should guide our interpretation of § 213.5 such that only the actual discovery of an indication of a defect would trigger a duty. But even in the context of the TSS as they were most recently amended, the FRA's interpretation of § 213.5 fits comfortably. Basing liability on constructive knowledge can serve as a deterrent to the performance of cursory or careless

22

inspections that might not even uncover indications of defects. Cf. 49 C.F.R. § 215.13 (2009) (requiring pre-departure inspection of freight cars but providing that performance of such inspections does not prevent a railroad from being liable for civil penalties for cars' noncompliance with freight-car safety standards).

In sum, we conclude that the FRA's interpretation of § 213.5 is eminently reasonable in light of the language of the regulation and in the context of the TSS as a whole. Accordingly, we defer to the FRA's construction and hold that § 213.5 obligates a track owner to address defects in its track structure that it actually knows of or should have discovered had it exercised reasonable care in conducting its inspections.

B.

With this clarification, we turn to Harris's contention that the district court properly held Norfolk Southern liable under § 213.5 because the railroad breached its duty to inspect the tracks as required by § 213.233 and that, had it not done so, it would have discovered and repaired the defect. Accordingly, we must also determine the scope of Norfolk Southern's duty to inspect the track under § 213.233.

Relying on the plain meaning of the regulatory language, Harris contends that § 213.233 unambiguously requires the inspector to actually look at every part of the track structure,

23

including all parts of the ballast, crossties, and the rails. Since the presence of debris covering a part of the track structure would prevent an inspector from visually inspecting the covered part, Harris argues an inspector has not visually inspected a track structure within the meaning of the regulation unless all such debris has been removed.

Norfolk Southern, on the other hand, maintains that a proper vehicle-based inspection that meets the speed and other requirements of § 213.233(b) is all that is required, and it insists that the regulation does not require railroads to remove all material from the track structure that could obstruct an inspector's view.  According to Norfolk Southern, requiring removal of all obstructions "would be functionally unworkable or impossible," would be unnecessary because "inspectors are trained to inspect track for defects even when all or a portion of the track is visually obscured," and "would upset the careful regulatory balance of inspection requirements and resource allocation reflected in FRA track inspection policy."  Brief of Appellant at 26.

In our view, neither Harris nor Norfolk Southern has properly described the scope of a track owner's inspection obligations under § 213.233.  The regulation requires a track owner to "visually inspect the track structure for compliance with" the TSS.  49 C.F.R. § 213.233(b).  The "track structure"

24

that must be inspected is defined to include the "ballast, crossties, track assembly fittings, and the . . . rails." 49 C.F.R. § 213.101 (2009). The regulation, however, does not define "visual[] inspect[ion]," and we therefore give those words their ordinary meaning. See Dickenson-Russell Coal Co., LLC v. Secretary of Labor, 747 F.3d 251, 258 (4th Cir. 2014). In this context, to "inspect" means "to look carefully at or over; view closely and critically," and "visually" means "by sight." Webster's Encyclopedic Unabridged Dictionary of the English Language 987, 2127 (2001). Accordingly, the visual inspection required by § 213.233(b) is a close and critical look at the rails and other parts of the track structure for the purpose of determining whether they are in compliance with the FRA's track safety standards.

While a close and critical look at the track structure is required, we cannot accept Harris's argument that every inch of every track must be seen in every inspection, such that every removable obstruction must always be removed. The language of § 213.233 does not explicitly so require, and we believe that the TSS as a whole indicate that that was not the FRA's intention.

We first note that § 213.233 permits visual inspections to be done on foot or from a vehicle moving over the tracks. Obviously, less of the track structure will be visible in a vehicle-based inspection than in an on-foot inspection, given

25

that some parts of the structure, such as certain areas beneath the rail head, are not visible from a moving vehicle riding above the track. Because vehicle-based inspections are expressly permitted, it is difficult to read § 213.233(b) as requiring an inspector to actually view every inch of every part of the track structure during every inspection.

Moreover, while the TSS clearly address the frequency with which inspections must be conducted, the number of tracks that may be inspected simultaneously, and the maximum speed for the inspector's vehicle when passing over track crossings and turnouts, they are completely silent regarding most other aspects of the inspection, including where the inspector must focus his attention, how much time he must spend during an inspection, and the speed he may travel over portions of the track other than track crossings and turnouts. The FRA was no doubt aware that in some situations it would not be feasible for an inspector to actually view every part of the track structure during a particular visual inspection. As Norfolk Southern points out, that would certainly be true of railroad tracks in city streets and roadways in which the track structure is covered by asphalt or concrete. Additionally, in colder areas where snow and ice might conceal portions of the track structure for long periods, the entire track would need to be cleared for

26

every inspection.[8] Accordingly, we cannot conclude that the duty to "visually inspect the track structure" obligates the track owner to visually inspect each and every part of the track structure during every inspection.[9]

Instead, we conclude that the duty imposed by § 213.233(b) is simply the duty to conduct a reasonable visual inspection in light of all of the circumstances. See 63 Fed. Reg. at 34,011 (explaining that § 213.233(b) "require[s] an inspector to perform an adequate inspection" (emphasis added)); cf. id. at 33,995 (using language invoking a reasonable-care standard for the required inspections when discussing the liability standard

_____

[8] Harris argues that the record does not contain evidence of the burden that would result to railroads from having to clear the tracks of all concrete, snow, ice, coal, and other debris before every inspection. We are entitled, however, to take judicial notice of commonly known facts, such as that asphalt and concrete cover parts of track structures in some urban environments and that snow and other debris can cover railroad tracks. See United States v. Lavender, 602 F.2d 639, 641 (4th Cir. 1979). In any event, we note that Division Engineer Carney testified that in certain areas, "the track structure is completely covered in snow" "for periods of weeks to several months" such that the area underneath the rail head is not visible. J.A. 2030.

[9] Harris also cites to the language in § 213.233(b) stating that one inspector may inspect two tracks simultaneously and that two inspectors may inspect up to four tracks simultaneously provided that the other tracks are centered a specified distance from the track over which the inspectors are riding and "provided that the inspector's visibility remains unobstructed by any cause." 49 C.F.R. § 213.233(b)(1), (2). This language, however, does not apply to an inspector inspecting a single track.

27

established by § 213.5); id. at 33,996 (same). In our view, this reading achieves a balance that reflects the FRA's intentions in promulgating the regulation, namely, to establish certain baseline, minimum requirements that require qualified inspectors to make reasonable efforts to look for visible signs of defects in the track structure while leaving them with the flexibility to make prudent inspection decisions based on their knowledge and experience.

While Norfolk Southern does not dispute that it must exercise reasonable care when conducting the visual inspections required by § 213.233, it contends that a vehicle-based inspection satisfies that requirement. As we have explained, however, § 213.233(b) requires a reasonable inspection, and the mere fact that the regulation permits vehicle-based inspections does not mean that such inspections always and as a matter of law amount to reasonable visual inspections. Instead, the reasonableness of any given inspection will depend on all the relevant circumstances, and particular circumstances might well make it unreasonable to conduct an inspection entirely from a vehicle. For example, a mark or other indication on the visible surface of the rail could indicate the possibility of a defect underneath. An inspector, charged with knowledge of the mark, would have to exercise his discretion and decide if this evidence was sufficient to require him to stop and walk the rail

28

to make a closer inspection.  He has a duty to exercise his discretion reasonably.

Likewise, if an obstruction on the tracks prevents an inspector from seeing what would otherwise be visible, then the exercise of reasonable care might require removal of the obstruction.  If the obstruction were reasonably expected to be of a relatively short duration, as might be expected in some situations involving snow or ice, then a decision not to remove the snow and ice for a better look might be reasonable when the rail would be seen without the ice or snow during the next inspection or a short time later.  In some instances a layer of light snow might obstruct a view of the rail, but cover a hundred miles of track, rendering it impractical to remove all of the snow but reasonable to leave it if one could expect it to melt a short time later.  The point is that there might be practical, reasonable reasons to excuse a railroad from clearing its tracks every time, everywhere an obstruction existed.

On the other hand, allowing debris covering a portion of the track to remain undisturbed might well be unreasonable.  For example, there is evidence in this case showing that the coal covering the tracks not only prevented Norfolk Southern from seeing the defects in the rail, but also contributed to the corrosion and ultimate failure of the rail, and that Norfolk Southern was aware that the presence of coal and other debris

29

around the track could cause corrosion of the rail leading to cracks and head/web separation. See J.A. 1558 ("[T]he presence of the coal, . . . based on my experience, has a significant effect on the corrosion."); J.A. 395 (post-derailment Norfolk Southern email stating that "the track has been buried in coal for years and the metal could very well be corroded to little or nothing"). If a railroad is aware that its track is embedded in substances that cause or accelerate corrosion, relying on vehicle-based inspections alone might not be sufficient; the exercise of reasonable care might well require the inspector to, at the very least, occasionally dig out portions of the embedded track to inspect for corrosion and other defects.

In either situation, the standard by which the inspector's decision would be judged would be whether the decision was reasonable in light of all the circumstances. Whatever the circumstances are, an inspector must examine the rails as a reasonably prudent inspector would, having due regard for the requirements and purposes of the inspection regulation.

C.

Having defined the duties imposed on Norfolk Southern by the TSS, we next turn to the question of whether Harris established a breach of those duties as a matter of law. We conclude that he did.

30

The evidence is uncontested that the rail in question in the Ben Creek track was for months or even years so covered in coal and other debris that the inspectors could not see the area of the rail beneath the rail head, which otherwise would have been visible during a walking or vehicle-based inspection. See J.A. 2026 (Carney's testimony that if coal debris covered the tracks up to the rail head, then there could have been no visual inspection of the portion of the rail that was covered). Norfolk Southern did not clear the track of debris or at least dig out sample areas of the debris to permit it to view sections of the embedded track structure, and Norfolk Southern had not conducted any ultrasonic testing on the area in question since October 2007, more than a year-and-a-half before the July 2009 derailment. Norfolk Southern thus was largely in the dark concerning the state of the rail, left with only the hope that if the track had deteriorated, some indication could be visible in the limited visible portion of the track structure.

As we have explained, a railroad need not view every piece of the track structure during every inspection. Nonetheless, Norfolk Southern failed for a period of months and years to actually look at any of the embedded portion of the track, despite its obligation to perform weekly visual inspections of the track structure. Under these circumstances, we believe that any reasonable jury would find that Norfolk Southern

31

breached its duty to visually inspect the track structure in accordance with § 213.233(b), and we therefore agree with the district court that Harris has established a breach of duty as a matter of law.

D.

Norfolk Southern argues that even if it breached its duty to inspect under § 213.233(b), a genuine dispute of material fact existed regarding whether the failure to visually inspect proximately caused the derailment and Harris's injuries. In this regard, Norfolk Southern contends that even inspections that complied with § 213.233(b) may not have revealed the defect because of its location under the rail head. Norfolk Southern emphasizes that § 213.233(b) allows inspections to be conducted from moving vehicles, and it submits that the record does not establish as a matter of law that such inspections would have uncovered signs of the defects in the track structure.

As we have already explained, under some circumstances a vehicle-based inspection will be sufficient; in such circumstances, the railroad would only be charged with the knowledge of what should have been seen from the vehicle. However, vehicle-based inspections do not always and automatically satisfy a railroad's obligation to visually inspect the track structure. Accordingly, the question is not whether the defect would have been discovered through a properly

32

conducted vehicle-based inspection, but whether the evidence establishes as a matter of law that a reasonable visual inspection of the track would have revealed the defect. Although the issue is a close one, we ultimately agree with Norfolk Southern that there are genuine issues of fact precluding summary judgment on the question of proximate cause.

There is no dispute that the cracks in the defective section of track had existed for an extended period of time before the derailment and that there was extensive corrosion on the track. Indeed, even Norfolk Southern's own expert described the damage to the rail as "the worst" he had ever seen. J.A. 1246. Nonetheless, the evidence is not so one-sided that we can say as a matter of law a reasonable visual inspection would have revealed the defect.

For example, Chris Bagnall, Harris's metallurgy expert, testified in his deposition that the degree of corrosion and crack formation on the broken piece of rail indicated that damage requiring remediation would have been present and could have been detected in 2009 by ultrasonic testing or by walking down the track and digging out areas of the coal debris to permit inspection. Bagnall, however, did not testify that signs of the defect appeared consistently across the length of the embedded track such that they would necessarily be discovered by an inspector digging out sample areas of debris, or that signs

of the defect would have been located far enough down the web of the rail that an inspector would necessarily have been able to see them even had the track been clear of debris. See J.A. 3800 (Bagnall's testimony that an inspector would not be expected "to see damage on the top of the rail" and that it would be difficult to see the cracking or corrosion because "it's underneath the head of the rail"). And while Harris also submitted a report from expert Alan Blackwell opining that Norfolk Southern would have discovered the defect had it "perform[ed] proper track inspections that included either visual detection or sounding the rail with a ball-peen hammer in the area if the track was embedded with dirt, coal and ballast," J.A. 958, that report was unsworn. Nonetheless, even if we considered Blackwell's report, Norfolk Southern's competing evidence raises sufficient questions about these expert conclusions to preclude summary judgment.

Because of the complications posed by the location of the defect under the rail head, we conclude that a jury could reasonably find that Harris has not proven that Norfolk Southern would have discovered the defect even had it not breached its duty to conduct proper visual inspections. Accordingly, the question of whether Norfolk Southern's breach of its duty to conduct the inspections required by § 213.233(b) proximately caused the derailment and Harris's injuries was one for a jury

34

to decide.[10]  We therefore conclude that the district court erred in granting partial summary judgment to Harris on this issue of Norfolk Southern's liability for the derailment.

## III.

In his cross-appeal, Harris argues that the district court erred in granting summary judgment against him on his claim for punitive damages.

Of course, in considering Norfolk Southern's entitlement to summary judgment, we must view the record in the light most favorable to Harris.  See T-Mobile Ne. LLC, 674 F.3d at 385. "In a diversity action, . . . the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law."  Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 278 (1989).

Although punitive damages under West Virginia law were originally "awarded only to deter malicious and mean-spirited conduct," the standard "has grown to include . . . extremely negligent conduct that is likely to cause serious harm."  TXO Prod. Corp. v. Alliance Res. Corp., 419 S.E.2d 870, 887 (W. Va.

---

[10]  Indeed, in light of our determination that a genuine factual dispute existed regarding whether reasonable inspections would have uncovered the defect, we also conclude that a jury issue existed regarding whether Norfolk had constructive notice of the defect and a duty to address it under § 213.5.

1992), aff'd, 509 U.S. 443 (1993). As the standard exists today, punitive damages may be awarded where a plaintiff shows "gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others." Crawford v. Snyder, 719 S.E.2d 774, 783 (W. Va. 2011) (internal quotation marks omitted). In our view, the record does not give rise to any reasonable inference that this standard was met.

Harris argues that "the undisputed evidence shows that, prior to the July 2009 derailment here, [Norfolk Southern] had known for years that compliant visual inspections of the track where the derailment occurred were not being conducted because the track was almost completely covered with coal, dirt, and other debris" and that "[t]he broken rail had developed over a period of years before July 2009 as a result of this gross neglect." Brief of Plaintiff-Appellee-Cross-Appellant, at 60-61. But even Harris recognizes that Norfolk Southern was hardly indifferent to the existence of rail defects of the type at issue here. In fact, Harris concedes (1) that Norfolk Southern contracted with Sperry to conduct ultrasonic internal rail defect testing at the Ben Creek Spur in 2009, (2) that had the damaged nine-foot section actually been tested, the defect would have been revealed, and (3) that it was only because Norfolk Southern inaccurately mapped the GPS coordinates of the Spur

36

that the nine-foot section was not tested.[11] See Brief of Plaintiff-Appellee-Cross-Appellant, at 10. There is no dispute that Sperry tested the rail at issue in October 2006 and October 2007 and discovered no defect in either of those years. And there is no evidence that Norfolk Southern realized that Sperry had omitted the section during its 2009 testing. Even if Harris is correct that Norfolk Southern's erroneous mapping was the cause of the omission,[12] that is simply not the sort of extreme negligence bordering on recklessness that could serve as the basis for an award of punitive damages. We therefore hold that the district court properly granted summary judgment on Harris's punitive damages claim.

## IV.

In sum, for the foregoing reasons, we affirm the grant of Norfolk Southern's motion for summary judgment on Harris's punitive damages claim and reverse the grant of summary judgment to Harris on the issue of Norfolk Southern's liability for the

---

[11] In fact, former Division Engineer Carney testified that he was satisfied that Norfolk Southern could adequately inspect the rail ultrasonically and actually do a more thorough inspection than it could do visually.

[12] Carney testified that even if Sperry did not test the nine-foot section in 2009, he did not believe that omission was due to inaccuracy of the track chart.

accident and remand to the district court for further proceedings.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>